(*Circuit Court of Cook County. In Chancery.*)

## The Atlantic and Pacific Telegraph Company

### vs.

## The Baltimore & Ohio Railroad Company and American Union Telegraph Company.

(March 30, 1880.)

1. CONTRACTS—PERFORMANCE BY ONE PARTY—ESTOPPEL AS TO TERMS. Where parties are in negotiation in reference to a joint adventure and one party notifies the other that he will proceed to expend monies and change his own status under the terms proposed to the other party and such other party stands silent and leads the first party to suppose that his terms are agreed to, such other party will be held to be equitably estopped from denying such proposed terms to be the terms of such joint adventure. Not having spoken when he should, he will not be heard to speak when he should be silent.

2. SAME—PERFORMANCE BY ONE PARTY OF IMPERFECT CONTRACT. If one party acts under an imperfect contract and the other party has the right to fix the terms of the contract subsequently, such party will not be allowed to fix other than "equitable terms."

3. EQUITY PRACTICE—AMENDMENTS—LIBERALLY ALLOWED. The objection that the proof and the allegations do not agree is well nigh obsolete in a court of equity. The statute provides that *any* amendments may be allowed in the discretion of the court.

If the proof shows that a party is entitled to relief the court will permit the amendment of the bill so as to conform to the proof.

4. ADEQUATE REMEDY AT LAW. Where the damages which a party will suffer are uncertain there is not an adequate remedy at law.

5. INJUNCTION—AFFIRMATIVE RELIEF—CONTINUING INJURY. Affirmative relief by injunction will seldom be granted, yet the court will not only restrain a party from wrongdoing but will also restrain him from continuing to do wrong, even if thereby the wronged party does obtain affirmative relief. The remedy by injunction is almost co-extensive with the remedy by specific performance.

6. INJUNCTION—WHEN ISSUED. The injunction writ should be issued with great caution by every chancellor, but courts of equity have never placed any defined limits to the exercise of the power.

7. CONTRACTS—CONSTRUCTION—UNUSUAL CONTRACT. Where the terms of a contract are in dispute and the agreement contended for by one party is extraordinary in its nature and one-sided the court will require the clearest evidence to establish the contract.

8. SAME—DISPUTE AS TO TERMS. Where a verbal contract for the erection of a line of telegraph along the right of way of a railroad is entered into between a railroad and a telegraph company and the railroad company claims the right to take possession òf the poles upon *accounting* for their cost and it is contended by the telegraph company that possession could not be taken unless *payment* of the cost of the poles was first made, the court will construe the contract to require payment of such cost as a condition precedent to the taking possession of such poles.

9. SAME—LEGAL RIGHTS UNDER—MUST BE EXERCISED IN GOOD FAITH. Even though an absolute and arbitrary power exists under a contract to do a particular act the court will not permit the exercise of such power, unless it is done in good faith. Good faith is of the essence of all contracts. The court presupposes in every contract a basis of good faith upon which all the stipulations contained in the contract must rest.

10. SAME—RIGHT OF RAILROAD COMPANY TO TAKE POSSESSION OF POLES OF TELEGRAPH COMPANY UNDER CONTRACT—GOOD FAITH. Where under a contract a railroad company has the right to take possession of the poles and lines of the telegraph company erected along the right of way of the railroad company this right cannot be exercised in bad faith and for the benefit of a rival telegraph company.

11. Public Policy—Courts Not Affected by. The courts cannot be influenced by the argument that it would be against public policy to grant the relief prayed for. "Public policy is an unruly horse, which, if a judge unwarily mounts, ten to one, he is run away with."

12. Equity—Injunction to Prevent Doing of Act Which Defendant Has Right to Perform Even if Injunction Issued. The court will issue an injunction to restrain a defendant from terminating an agreement which it is sought to terminate in bad faith, even though such party can thereafter terminate the agreement at its pleasure.

Motion for injunction. Heard before Judge Murray F. Tuley.

Tuley, J.:—

The facts of this controversy I find to be substantially as follows: It appears that in September, or early in October, 1873, negotiations commenced between Thos. T. Eckert, then president of the Atlantic and Pacific Telegraph Company, the complainant, and John W. Garrett, president of the defendant, the Baltimore & Ohio Railroad Company, for the putting into operation a joint telegraph system for the two companies on the line of that portion of defendant's Baltimore & Ohio Railroad, known as the Central Ohio Division, and which might be extended over the entire lines of road of the Baltimore & Ohio Company, with such modifications as might be agreed upon.

A proposition was submitted by President Eckert to President Garrett, apparently in compliance with the latter's request, by which the Atlantic and Pacific Company proposed to erect a line of poles at its own cost on line of defendant's road between Wheeling and Columbus; the wires of the railroad company to be transferred to the new line of poles, and the railroad company to have the right to put on additional wires, as it desired; the Atlantic & Pacific Company to have the right to put on a through wire for its exclusive use, and the railroad company to put an additional wire for the joint use of the two companies. The telegraph company was to furnish main battery power for operating all the wires, and

to pay one-half the compensation of operators at the principal railroad stations. Other details as to the use of office room, and the division of the receipts were included in the proposition.

This proposition was made October 9, 1875, and appears to have been made after the parties had arrived at an agreement to act together, and was made for the purpose of arranging its details. In the letter containing the proposition referred to, President Eckert writes that the poles for the work are "being loaded today," and asks to be informed by telegraph whether the work could proceed; also that President Garrett have a formal contract drawn and forwarded.

On October 15, 1875, Eckert again writes Garrett, enclosing copy of contract covering the Central Ohio Division, which he states comprises the various modifications and additional points elicited during "our conference," referring evidently to some conference held between the 9th and 15th of October. Eckert refers to the fact that he finds the word "free" erased, and offers reasons why it should remain in, and states that he having executed the enclosed copy, requests Mr. Garrett to have another copy made and duly executed and forwarded to him, Eckert. On the 16th of October, 1875, Eckert informs Garrett that upon receipt of notice that poles, wires and insulators proposed to be shipped to Chicago Junction, near Chicago, the telegraph company will put them up to the office of the railroad company in Chicago, and, if necessary, place them in the telegraph company's right of way. On the same day Eckert writes Garrett that "agreeably to our conversation I have respectfully to present for your consideration the following plan for operation of the telegraph lines of the Baltimore & Ohio Railroad Company," and submits a long detailed plan of operation and statements as to how the earnings of the line are to be divided, and notifies Garrett of the amount of territory covered by the Atlantic & Pacific telegraph wires. He says: "If this arrangement is agreeable to you, as I hope it may be, this letter and yours in reply signifying that fact will form all the agreement that need be entered into between the two companies, at least for

the present. If, upon a trial of this plan, modifications should be made desirable in any feature thereof, we shall cheerfully meet you in so framing them as to render the arrangement entirely agreeable; or it may be terminable entirely at your pleasure on giving such reasonable notice as will prevent inconvenience to the public 'and ourselves.''

On the 19th of October Eckert, by letter to Robt. Stewart, superintendent of telegraph for the Baltimore & Ohio Railroad, requests him to meet Mr. Bates at Wheeling by Thursday morning, to arrange the details of carrying on the work of construction of the new joint lines on the Central Ohio Division, and that Mr. Garrett gave him to understand that he might proceed with the work on that division, but, he, Eckert, has waited for the formal execution of contract before actually beginning work. Upon the same day he writes to Garrett that he has the poles and men ready, and requests that he inform him if he can proceed with the work.

It appears by a letter of Bates, superintendent of Atlantic & Pacific Company, to Stewart, that the connection of the Central Ohio Railroad would be completed December 15th, at which time he says ''we will have wire connection with your lines at the following places: Wheeling, Newark, Columbus, Sandusky and Tiffin.''

Early in 1876, certain correspondence appears between the parties relative to certain tolls and proportions of tolls at certain points, and also as to additional wires between Tiffin and Chicago to be placed by the Atlantic & Pacific Company, but subject to agreement to be made with Garrett. In October, 1876, Eckert, in a letter to Garrett, says that he is authorized by his executive committee to proceed at once to erect a wire from Washington or Baltimore to Cincinnati, on the poles along the Baltimore & Ohio Railroad, and that he will, unless he, Garrett, sends instructions to the contrary, proceed with the work ''on our own account.'' This wire ''may be considered to be subject to such of our propositions now before you as you may in future accept, 'or if you desire to own it subject to the general arrangement, you may have the

option of doing so at cost on one year's notice to us, and this letter will be our agreement to that effect.''

November 25, 1876, Mr. Eckert again writes to Mr. Garrett that he, having permitted the Atlantic & Pacific Telegraph Company to connect with telegraph lines on his Chicago, Lake Erie, Metropolitan and Valley divisions, he, Eckert, has again renewed his request for like actions as to the Marietta & Cincinnati Railroad, March 1, 1877, Stewart writes to Eckert that there is nothing to prevent his company putting up an additional wire desired on the Central Ohio and Chicago Division and Hempfield roads, and the division between Columbus and Newark, the agreement to be made with him, Garrett, as to the terms on which these wires are to be used.

This is substantially all the written evidence that is found bearing on the question as to what was the contract between the telegraph and the railroad company. I think it clearly appears that there were repeated conversations between the presidents of the two companies in which the terms of this joint arrangement were discussed.

It is from the affidavits which disclose what occurred at these conversations and those which relate to the conduct of the parties subsequent to the making of the joint arrangement—taken together with the evidence as to the contract contained in the letters referred to—that we are to determine what was the agreement between the telegraph and the railroad company, for it is admitted by both sides, that there was an agreement of some kind—they disagree, however, as to the terms of that agreement. The complainant contends that the contract, or agreement, was in substance as set out in the letters referred to, while the railroad company replies, that the letters contain only propositions and terms made by the telegraph company and not accepted by the railroad company, and that propositions coming from one side only can not be held to constitute an agreement; in other words, that it takes two to make a bargain. It is true that no replies appear to have been made by the railroad company to these propositions and requests of the telegraph company. If the

telegraph company had received them it is to be assumed they would have been presented in evidence, if they were of a nature that indicated an assent to the terms of the agreement proposed by the telegraph company, and, on the other hand, if the railroad company did reply to these letters containing propositions upon which the telegraph company proposed to enter into this joint system of telegraph lines, and such replies indicated a dissent, it is to be assumed the railroad company would have produced copies thereof. The fact is, that the telegraph company appears to have been extremely anxious to have the terms definitely settled and a written contract executed, and the railroad company equally as anxious to leave the terms of the joint arrangement as indefinite as possible, and to avoid the execution of a written agreement. It is, I think, apparent that the latter company desired to get the telegraph company to expend its moneys in the erection of new poles, wires, etc., and making connections with defendant's wries to as large an extent as possible —to get it so far involved in the new arrangement that it could not recede without great loss,—and this without the railroad company having definitely committed itself as to the terms of the joint arrangement, either in writing or otherwise.

This course may have been perfectly justifiable in a business point of view, but it can scarcely expect to find commendation in a court of equity. It is admitted that the complainant did proceed to erect new telegraph poles on what is called the Central Ohio Division, from Wheeling over the Bellaire Bridge, and thence to Columbus, Ohio,—that the wires of the defendant railroad were transferred to the new poles, and new wires were placed thereon as proposed by complainant in letter of October 9, 1875. That complainant also, in pursuance of the negotiations before referred to, did place a wire between Tiffin, Ohio, and Chicago, and did erect poles and string wires upon what is known as the Hempfield Branch, between Washington, Pennsylvania, and Wheeling, and that all, or substantially all, of the various lines of railroad owned or operated by the Baltimore and Ohio Company,

were jointly operated by the complainant and the railroad company; the complainant erecting poles and wires upon some of the lines, and upon others placing new wires on the poles owned by the railroad company. Among the last was a wire erected from Washington or Baltimore to Cincinnati, in accordance with the proposition which is found in the letter of October 16th, 1876, a date more than one year after the commencement of the first negotiations.

Independent of the evidence found in the affidavit for the defendants filed in this cause, I apprehend that upon the principle that where parties being in negotiations for, and having agreed to go into a joint arrangement or adventure—one notifies the other that he will proceed to expend moneys, and change his own status upon the proposition as to the terms theretofore made to such other party, and such other party stands silent, and leads the first named party to suppose that his terms are agreed to, such other party will be held to be equitably estopped from denying such proposed terms to be the terms of such joint adventure or arrangement. Not having spoken when he should have spoken, he will not be heard to speak when he should be silent. So that, except so far as the affidavits on the part of the defendants show a change of the proposed terms, I remark, that upon this principle I must conclude that the terms of the arrangement were as contained in the letters—the evidence showing that the telegraph company did act and did expend large amounts of money after submitting such proposed terms.

In any event, if complainant acted, leaving Mr. Garrett the right to fix the terms subsequently, he would not be allowed to fix other than *"equitable terms."* As to the important question (as to which the defense claims the railroad company did speak out) i. e., as to the length of time this joint arrangement was to continue, it was *prima facie* the case made by the complainant, to be terminable entirely at the pleasure of the railroad company upon giving such reasonable notices as would prevent inconvenience to the public and to the telegraph company. This is the provision contained in the plan of operation and basis of agreement pro-

posed in President Eckert's letter to President Garrett of
date the 16th of October, 1875, which I have before referred
to as being one of the letters that demanded some sort of an-
swer on the part of the Baltimore & Ohio Railroad Company.
This letter, and one written more than one year after, to wit:
Oct. 16, 1876, are the only ones which contain propositions in
which the length of time the joint arrangement is to continue,
is in any way referred to. The last one referred to is in ref-
erence to the erection of a wire from Baltimore to Cincinnati,
in which President Eckert says he will proceed with the work,
unless he, President Garrett, sends instructions to the con-
trary; also that "this wire may be considered subject to such
of our propositions now before you, as you may in future ac-
cept, or if you desire to own it, subject to the general arrange-
ment, you may have the option of doing so at cost on one
year's notice to us, and *this letter* will be our agreement to
this effect." The general arrangement referred to, I take it,
must mean the general arrangement contained in the letter
of the 16th of October, 1875, in which it is proposed (among
other things) that receipts for telegraphing between points
reached only by the Baltimore & Ohio line were to accrue
entirely to that company, but where both companies had
wires, the receipts were to be divided as in that letter speci--
fied; that is, the proposition was that the Baltimore & Ohio
Company might appropriate the whole receipts after having
paid the cost of the wire, having given one year's prior notice
of their desire to do so. It appears to be a singular propo-
sition for President Eckert to make, if he understood, at that
time, that the Baltimore & Ohio Railroad Company had the
right to terminate the agreement as to all the other lines at
its pleasure, without notice, and without paying therefor, be-
fore taking possession.

This letter was not replied to, but the wire was erected,
and I must, from the case as made by the complainant, con-
clude that the defendant railroad company had the right to
treat it as subject to the general arrangement, which I under-
stand from the letters, to be that the Baltimore & Ohio Rail-
road Company was, in the event of the termination of the joint

arrangement, to have the possession of all the property jointly used upon the payment therefor, and to have, as before stated, the right to terminate the arrangement at its pleasure, giving such reasonable notice as aforesaid.  This is the case as made by the complainant.

But it is said that *this* is *not* the case as made by the bill, but as the *allegata* and *probata* do not agree, that complainant can have no relief.  I shall dispose of this objection, by remarking that our statute of 1872 having provided that at any time before final judgment in a civil suit *any* amendments may be allowed in the discretion of the court, that this objection has well nigh become obsolete in a court of equity, certainly as to proceedings therein prior to final decree.  Even independent of the statute, I know no reason, upon an application of this kind, if the complainant's case or the defendant's case as presented, or a part of each, show such a state of facts as calls for relief, and will justify the use of the writ of injunction, why this court should not permit the complainant to amend his bill so as to entitle him to the writ.

Another objection is, that the damages are not irreparable, and may be compensated in an action at law.  I do not think so.  The defendant has taken from the complainant the possession of wires which form part of a circuit or of various currents; wires which the complainant was obliged to use, not only for communication to points along the lines of the wires, but also to other points and cities which are connected by other wires at various points on the lines of the wires taken possession of.  How much business will fail to come to the complainant by reason of the public knowledge that it no longer has the control of these wires, must be left to the imagination; and the offer of the defendants to send its messages at usual rates, as between telegraph companies, cannot be held to give us a criterion by which we can measure the damages of the complainant.

Another objection urged is that complainant is, in fact, asking affirmative relief: a restorative injunction; that the office of the writ is preventive only, and, therefore, inasmuch as the defendant has already taken complete possession, the

writ cannot, or should not, issue. It is an ungracious defense, to say the least, for the defendant to set up, even if it were one which is sustainable. While it is true that affirmative relief as such will seldom be granted, yet the court will not only restrain a party from doing wrong but will also restrain him from continuing to do wrong, even if thereby the wronged party does obtain affirmative relief. Jeremy defines an injunction to be "a writ framed according to the circumstances of the case commanding an act which a court of equity regards as essential to justice or restraining an act which it esteems contrary to equity and good conscience." The object of the writ is generally preventive and protective rather than restorative; although it is by no means confined to the former; it seeks to prevent a meditated wrong more often than to redress an injury already done.

With reference to injunctions to enforce contracts or to forbid a violation of its terms, says Snell in his Principles of Equity: "The jurisdiction of equity may almost be said to be co-extensive with its power to compel specific performance. Whatever duty a court of equity will compel a party to perform, it will generally, on the other hand, restrain him from violating in many cases. Therefore, it will be seen that the court in exercising its jurisdiction to restrain a party from doing an act is in effect compelling a specific performance of that act;" and that it will not suffer parties to depart from their contract at their pleasure, leaving the party with whom they have contracted to the mere chance of any damage which a jury may give.

In this case the injunction to restrain the defendants from applying the telegraph wires, etc., to other purposes than that contemplated by the joint arrangement existing between the parties, would be within the province of a court of equity, although it might operate as a decree for the specific performance of the agreement for the time being. But this injury is in the nature of a continued injury, a continued trespass—as it continues day by day to prevent the defendant from carrying on its business of telegraphing in the various circuits with which these lines are connected. As I suggested on the

hearing, if a party took possession of a small section of a railroad track which act prevented the working of the entire line, there could be no doubt of the power of this court to enjoin him from continuing to interrupt the railroad travel until the rights of the parties could be determined.

Courts of equity have never placed any defined limits to the exercise of this power, and as new species of property are being created, new rights evolved by the progress of commerce and civilization, the necessity for its use cannot be foreseen or predetermined. It is a writ that should be used with great caution by every chancellor, but there is no writ in these days,—when corporations as powerful as the government itself exist,—that can be used more beneficially, particularly in controlling such corporations, and at the same time protecting the public against injuries arising from these wars carried on upon the principle that "might makes right."

Having disposed of these technical objections, which, with due deference to defendants' solicitors, are in fact mere cobwebs to be brushed aside in arriving at the true equities of a case of this kind, let us consider how far the case as made by the complainant's bill, affidavits, and the admitted acts of the parties has been overcome by the defendants.

It will be observed that neither the bill nor answer are sworn to by parties who had any personal knowledge of the negotiations which resulted in the agreement between the Atlantic & Pacific Telegraph Company and the Baltimore & Ohio Railroad Company, and their value as affidavits is much lessened by that fact. The case as made by the defendants rests substantially upon the affidavits of Garrett, president of the Baltimore & Ohio Railroad company; of Eckert, then president of the Atlantic & Pacific Telegraph company, and one Bates, who was superintendent of the Atlantic division of the Atlantic & Pacific Telegraph lines, all of whom are now in the service of the defendant corporation, the Baltimore & Ohio Railroad company. It is admitted that the negotiations and the settlement of the terms of the agreement were all done and conducted by the president of the two com-

panies. Mr. Bates says he was present at six or seven interviews between the two presidents; and in another part of his affidavit, that he was present at all the interviews—and undertakes to tell the result of the several interviews. It will be noticed that the affidavits of these three parties do not profess to give us the terms and the agreement between the two companies, except in these two particulars, to wit, as to the right of the Baltimore & Ohio Railroad Company to terminate the agreement and take possession of the property and as to the payment therefor. President Garrett testifies upon these points in substance, that there was no written agreement, that he gave a verbal license to put wires on the railroad poles on a part of the lines, and on other parts, to put up both poles and wires, and to operate the same, but with the understanding that the railroad company might at any time revoke the license, and, *if it should so elect,* take possession of the complainant's property put on its various lines of road under this arrangement or licence. That President Eckert, when the matter was first under consideration, desired to have some fixed period of notice when this should be done, but that Mr. Garrett at all times positively declined to grant such a stipulation. He, as to the final agreement as to notice and time of termination of the agreement, says: "I could not tell at what moment the changed relations between the Atlantic & Pacific and Western Union Telegraph companies, and the necessities of the Baltimore & Ohio company might require me to have full and prompt possession of the Baltimore & Ohio Road, and its connections. Therefore, in the final interview, at which the matter was arranged, which took place at my house in the city of Baltimore, between General Eckert and myself, Mr. D. H. Bates, then superintendent of telegraph of General Eckert's company, being, as I think, present, it was conceded by General Eckert, and distinctly agreed upon between us, as an essential part of the arrangement made, that I was to be at liberty any time I pleased, to revoke the license I was giving to the Atlantic & Pacific Telegraph Company, on the part of the Baltimore & Ohio Railroad Company, to use and operate tele-

graph lines along it and its connections, and at the same time to take possession, if I so pleased, of all the poles that might be erected along the line of the Baltimore & Ohio Road, its branches, divisions, and its connections by the telegraph company, *accounting for them* at their original cost."

President Eckert says: "It was a part of the arrangement between the two companies that the Baltimore & Ohio Railroad Company should be at liberty to take the poles and wires that should be constructed or used by us in maintaining the lines of telegraph wires on the Baltimore & Ohio Railroad; that the last named company should be at liberty to take the same at any time, *paying therefor* to the Atlantic & Pacific Telegraph Company the cost price thereof.

"During the negotiations under which this arrangement was made, I tried, in behalf of the company I represented, to get Mr. Garrett to agree that the Baltimore & Ohio Railroad Company should give one year's notice before taking possession of the poles and wires, under the arrangement I have spoken of as having been made with that company. Mr. Garrett expressly declined to make any such arrangement, and stated that he must be left at liberty to take these wires and poles at any such time as he might see fit, without giving notice, to which I agreed, and so the matter was left, and so remained during the time that I was president of the Atlantic & Pacific Telegraph Company, without any understanding between the two companies that any notice should be given, as required on the part of the Baltimore & Ohio Railroad Company, whenever it should desire to take possession of the poles and wires already referred to."

Mr. Bates says: "That at the various interviews during the years 1875, 1876 and 1877, the said John W. Garrett, as president of the said railroad company, in each and all of the interviews aforesaid, declined to accept or approve of any written contract between the said telegraph company and the said railroad company, and would not make, as agent, any written agreement on the subject, but simply gave his verbal consent and temporary license to the said Thomas T. Eckert, president of said telegraph company, for the construction of

various lines of telegraph between Washington, Pennsylvania, and Wheeling, West Virginia, and Columbus, Ohio; between Tiffin, Ohio, and Chicago, Illinois; between Washington, D. C., and Cincinnati, Ohio, and between Washington, D. C., and Alexandria, Virginia; said lines to be built at the cost of said telegraph company; to be at all times and at any time subject to their being taken possession of by said railroad company, when he, the said president, John W. Garrett, might so elect. The reason given by the said John W. Garrett, during and at the various interviews aforesaid, for declining to make any written or formal agreement with said telegraph company was, that he proposed and desired to protect the interests of his railroad company against the prejudicial effects of any sale, amalgamation, or other arrangements on the part of the said Atlantic & Pacific Telegraph Company, or any other company.''

The affidavit of Mr. Bates might be justly criticised. It is very broad and comprehensive; indeed, too much so. Mr. Eckert's statement, and Mr. Garrett's, as to the payment for the property of the Atlantic & Pacific Telegraph Company, do not agree. Mr. Garrett says he was to have the right, at his election to take it. Mr. Garrett seems to consider the agreement as giving him the right to terminate it any time, and that he might, at ''his election,'' ''if he so pleased,'' take possession of all the wires and poles that might be erected along the lines of the Baltimore & Ohio Railroad Company, payment of course to be made therefor. As to taking possession and paying for the property, there was nothing obligatory on the railroad company, even if they should terminate the agreement, is what is to be understood from Mr. Garrett's affidavit.

The affidavit of Mr. Eckert is to the effect that Mr. Garrett was to be at liberty to take these wires and poles at any time he should see fit. Both affiants aver that Garrett had the right to terminate the agreement at his pleasure, but as to taking possession of complainant's property and paying therefor, Garrett's affidavit makes the doing so optional with Garrett, while Mr. Eckert's affidavit makes it obligatory to

do so on terminating the agreement. Mr. Garrett says if he so pleased he was to take possession of the wires and poles, accounting for them at their original cost, while Mr. Eckert says that Mr. Garrett was to be at liberty to take the same at any time, paying therefor to the Atlantic & Pacific Company the cost price thereof. Mr. Bates says nothing as to any payment to be made for the wires, etc.

A contract giving the right to take possession of another's property at any time Mr. Garrett pleased, *accounting* therefor at the cost price, and a contract giving the right to take possession of another's property at any time Mr. Garrett pleased, *paying* therefor the original cost are two very different contracts. In the one payment is a condition subsequent, in the other, payment, or tender of payment at least, is a condition precedent. The title passes in the one case without payment, and the debt remains, in the other the title passes by payment. If Mr. Garrett and Mr. Eckert each understood the agreement on this point, as stated in their respective affidavits, the minds of the contracting parties failed to meet on a vital point, as to the condition upon which the Baltimore & Ohio Railroad Company had the right to take possession of the property of the complainant. The most reasonable agreement, the one that would have been most reasonable under the circumstances, was that payment should precede, or at least, be co-incident with the taking of possession. The agreement contended for on the part of Mr. Garrett is one of so extraordinary a nature, to my mind, as to require the clearest evidence that a contract so one-sided was entered into between the presidents of these two corporations. I think the fact is, that payment was to be made upon taking possession, and it was to be a payment of the original cost and not a balancing or settlement of accounts. The complainant has failed to sustain the allegation as to one year's prior notice to be given of intention to terminate the agreement as to a line, or portion of a line, of the Baltimore & Ohio Railroad Company, and as to the averment as to "reasonable notice" while there is much in the case as presented to show that complainant had the right to insist on "reason-

able notice'' of the intention to terminate the agreement—yet the case as now presented (whatever may be the result upon final hearing) does show that the Bailtimore & Ohio Railroad Company was not bound to give any prior notice. In the view, however, that I take of this case as now presented, it is not material for the purpose of this motion whether the notice was to be a reasonable one, or whether there was to be no notice. But, assuming that the Baltimore & Ohio Company had the right reserved by the verbal agreement to at any time terminate this joint arrangement or agreement, and take possession of the lines paying therefor, yet this was a right to be exercised with the proviso which underlies every right in every contract in a court of equity—to wit, that it be exercised in good faith.

It is argued by the defendants, that these parties were able to contract; that they are presumed to have had in view all the consequences, and that it is no matter if complainant is damaged or ruined—if it was a right, this court cannot consider the consequences. This is true as a legal proposition. But a court of equity will scan, as with an eagle's eye, the circumstances attending the exercise of that legal right, to discover, if possible, whether the right has been exercised in good faith, or whether the virus of *mala fides* has destroyed the vitality of the act. This arrangement between these companies was in the nature of a copartnership, or joint adventure; the property of each was used to make money for both, and was used as joint property for the common benefit. By the joint arrangement the property of the parties became to some extent so intermingled that it was necessary on its termination that the railroad company should own all the property, and for the railroad company's own security it was necessary that this power to terminate the joint arrangement and take possession should exist. As before stated, if the power had been exercised for the purpose it was given, and in good faith, it must be sustained.

The principles laid down in the case of *Blisset v. Daniel,* 10 Hare, 483, applied to the facts upon this part of the case, are, to my mind, decisive of the question whether or not this

power has been exercised in good faith. In that case an arbitrary power was given to two-thirds of the members of the copartnership to expel any partner from the firm. It could be done without cause, without a convention of the partners, without notice, simply by signing a notice of expulsion and delivering the same to the partner, or at his place of residence. Under this power, one of the parties was served with notice of his expulsion and payment of his share tendered to him. He filed a bill to declare the notice of expulsion void, for an accounting and a dissolution of the copartnership, and distribution of the assets in the way usual to courts of chancery. The Vice-Chancellor Wood, in a remarkably able opinion after observing that this power of expulsion was the exercise of a strict legal right, and that the construction to be given to the words of the power should be of the strictest character, and that in a court of equity everything would be considered strictly against the parties exercising the power of expulsion, reviews the various clauses of the articles of copartnership, and holds that the defendants were competent to give a notice to dissolve without assigning any reason, without holding any meeting or convention of the parties, but he says (p. 522) : "The power must be exercised *bona fide,* Good faith is unquestionably of the essence of all contracts. Sir Fitzroy Kelly (one of the solicitors) has said that I could not introduce any new words into this contract. The court does not do so, but the court presupposes in every contract, and if there can be a difference, more especially in every contract of partnership, a basis of good faith, upon which all the stipulations contained in the deed must rest. This power would never be allowed to be exercised by this court in a manner against what I may call the truth and honor of these articles. . . . It is quite clear that this power was never intended to be exercised by any two-thirds of the partners, merely and solely for their own exclusive benefit. If cause be shown, of course it removes all difficulty with reference to fraud, using that word according to the sense in which the court uses it; but if cause be not shown and proved, then it must be very clearly made out that the exercise of the

power has been in good faith." He then supposes certain tests to show that the liberal construction of the articles could not be enforced, although, in fact, the parties were not obliged to assign any particular cause for the act of expulsion.

It appears that there had been trouble between a Mr. Vaughan, one of the partners, and the one sought to be expelled, and that Mr. Vaughan had obtained the assent of the remaining partners to Mr. Blisset's expulsion. Upon the ground that the power was not really used for the benefit of all the two-thirds, but only for that of the one with whom the quarrel was had, he decides that in that respect the power was not exercised in good faith. He holds that the notice of dissolution is void, upon the ground that it was clandestinely obtained by one partner, and at his instance alone (without notice to Blisset), and that it, the power, was not *bona fide* exercised on the judgment of all the partners. "I am obliged," he says (p. 535), "to hold it to be so, and that in this court, whatever notions may be entertained elsewhere, is held to be, as regards that partner, a fraud upon him, and on that account to be void." He then adds (p. 536) in words that I wish might be,—as to the standard of morals there laid down—burned into the memory of all solicitors of this court, the following: "As has been well observed during the course of the argument, the view taken by this court with regard to morality of conduct amongst all parties—most especially amongst those who are bound by the ties of partnership —is one of the highest degree. The standard by which parties are tried here, either as trustees or as copartners, or in various other relations which may be suggested, is a standard, I am thankful to say so, far higher than the standard of the world; and, tried by that standard, I hold it to be impossible to sanction the removal of this gentleman under these circumstances."

Tried, then, by this statement, which is far higher than the standard of the world, was this power exercised in good faith? In the first place, the primary object of this power being reserved to the railroad company, was for its own protection. It was not to enable the railroad company to obtain

any unfair advantage over the telegraph company and obtain its property at an undervalue, or to enable it to wantonly or oppressively injure or destroy the telegraph company; nor to enable the railroad company to speculate upon the property it might acquire by terminating the agreement, but it was solely to be used for its, the railroad company's, own protection and benefit. No cause of complaint appears to exist against the telegraph company; it does not appear that it has not carried out its contract in good faith, nor does it appear that it was necessary for the protection of the railroad company that the agreement should be terminated. The same day it was terminated, an arrangement was made by the Baltimore & Ohio Company with a rival telegraph company. Was it good faith to terminate the agreement to benefit a rival in business of the telegraph company's? Was it *bona fide* exercise of this power to terminate this agreement for the joint benefit of the railroad company and the American Union Telegraph Company? Tried by the standard of morality that prevails in this court, both these questions must be answered in the negative. Would the exercise of this right in order that the railroad company might have an advantage in the settlement of accounts, be an exercise of the power in good faith? Most clearly not. The defendant railroad company does not by its answer state that it offered to pay for the property, or that it is now willing to pay for the same. The only offer it made on taking possession, or now makes, is to adjust accounts. Does good faith resort to deceit and fraud to enable it to exercise a clear, legal right, as by giving notice, on the 28th of February, that possession would be taken on March the 1st, and then taking possession clandestinely within five hours after the notice is given? This may be justifiable by a standard of good faith that exists elsewhere, but cannot be justified by the standard that exists in a court of conscience.

I do not overlook the fact that the railroad company claims to have given notice in September, and on the 14th of February last, of its intention to terminate this agreement, but the fact of such notice being given is disputed. It was a

verbal notice,—the railroad company appears to dislike written communications—and was of such character that the parties to whom it was claimed to have been given deny that the verbal communications were notices as alleged.

In conclusion, I find this power to terminate the agreement at any time the railroad company desired, did exist, but that the power has not been exercised, the attempted exercise of it being in bad faith was a nullity, and the parties stand as to their rights under the agreement, just where they stood before that attempt was made.

As to the point made, that the recent act of congress permitting railroads to do a telegraph business, is void, and therefore that the railroad company had no power to carry on a commercial telegraph system, it is sufficient to say, that if the railroad company is exercising franchises that it has no right to exercise, the representatives of the people must inquire into that by the proper proceedings.

As to the argument that it is against public policy to sustain the telegraph monopoly, counsel could scarcely have expected me to be influenced by it. This is a court of rights, not of public policy. I try to bear in mind the remark made by Mr. Justice Burrough,—"Public policy is an unruly horse, which, if a judge unwarily mounts, ten to one, he is run away with." But, it may be asked, if the railroad company can terminate the agreement at its pleasure *cui bono;* what end will be accomplished by an injunction which will permit the old relations or connections to be restored? In *Blisset v. Daniel, supra,* I have no doubt the same argument was made, yet the vice-chancellor did not decline to take jurisdiction, but, having obtained jurisdiction, he proceeded to take an account and to dissolve the copartnership, not according to the articles, but in accordance with the practice of the court of chancery and principles of equity.

This court having obtained jurisdiction to afford the complainant relief by injunction, will control the further proceedings of the parties, not in opposition to their agreement, but having ascertained by the light which a cross-examination of the witness and a final hearing will let in upon the facts,

all the information necessary to determine the rights of the parties, it will proceed to settle them according to the practice of a court of chancery and the principles of equity that prevail in that court. The complainant is, therefore, entitled to an injunction restraining the defendant from further interfering with the complainant in the use and control of the poles, wires and property (described in the bill), in the same manner and to the same extent as it, the complainant, had, and was exercising the use and control thereof on and prior to the 28th of February last.

The complainant may make amendments, if the solicitors deem it necessary to make any amendments, and prepare an order for an injunction.